# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CALEB O. ENGLE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10cv00059 |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Caleb O. Engle, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2011). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which

Case 2:10-cv-00059-JPJ-PMS   Document 16   Filed 09/28/11   Page 1 of 26   Pageid#: 488

a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Engle protectively filed his applications for DIB and SSI on July 27, 2007, alleging disability as of May 5, 2007, due to back problems, leg pain and anxiety. (Record, ("R."), at 110-13, 114-16, 135, 139, 194.) The claims were denied initially and on reconsideration. (R. at 58-60, 66, 68-70, 72-74, 75-76, 78-79.) Engle then requested a hearing before an administrative law judge, ("ALJ"). (R. at 80-81.) The hearing was held on June 10, 2009, at which Engle was represented by counsel. (R. at 22-52.)

By decision dated June 29, 2009, the ALJ denied Engle's claims. (R. at 9-21.) The ALJ found that Engle would meet the nondisability insured status requirements of the Act for DIB purposes through December 31, 2011. (R. at 12.) The ALJ also found that Engle had not engaged in substantial gainful activity since May 5, 2007, the alleged onset date. (R. at 12.) The ALJ determined that the medical evidence established that Engle had severe impairments, namely degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine with a herniated disc, degenerative disc disease of the thoracic spine with a herniated disc and obesity, but she found that Engle's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix

1. (R. at 12-14.) The ALJ also found that Engle had the residual functional capacity to perform light[1] work that did not require him to climb ladders, work around unprotected heights or use dangerous or vibrating machinery or do more than occasional crouching, crawling or stooping. (R. at 14-18.) The ALJ found that Engle also would need to change positions in place every 15 to 20 minutes and was limited to simple, noncomplex tasks. (R. at 14-18.) The ALJ also stated that Engle would work best in an indoor, climate-controlled environment. (R. at 14-18.) Therefore, the ALJ found that Engle was able to perform his past relevant work as a disc jockey. (R. at 19.) Based on Engle's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ also found that there were other jobs, such as work as a nonemergency dispatcher, a machine tender and a telephone order clerk, that Engle could perform. (R. at 19-20.) Thus, the ALJ found that Engle was not under a disability as defined under the Act and was not eligible for benefits. (R. at 20.) *See* 20 C.F.R. §§ 404.1520(f)-(g) 416.920(f)-(g) (2011).

After the ALJ issued his decision, Engle pursued his administrative appeals, but the Appeals Council denied his request for review. (R. at 1-5, 53.) Engle then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2011). The case is before this court on Engle's motion for summary judgment filed January 20, 2011, and the Commissioner's motion for summary judgment filed March 24, 2011.

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2011).

-3-

## II. Facts

Engle was born in 1960, (R. at 110), which at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Engle completed the eighth grade. (R. at 49, 144.) He has past relevant work experience as a hospital cook and a disc jockey. (R. at 28-29.)

Sierra Olivia P. Saliers, a vocational expert, also was present and testified at Engle's hearing. (R. at 45-52.) Saliers classified Engle's work as a hospital cook as medium[2] to heavy[3] and skilled, and as a disc jockey as light and skilled. (R. at 45-46.) Saliers was asked to consider a hypothetical individual of Engle's age, education and work experience who was limited to simple, noncomplex light work indoors in a climate-controlled environment, who could not climb ladders, work at heights or around dangerous or vibrating machinery, who was limited to occasionally crouching, crawling and stooping and who would need to change positions every 15 to 20 minutes. (R. at 50.) Saliers stated that work as a hospital cook would be precluded, but that such an individual could perform work as a disc jockey. (R. at 50.) Saliers also testified that such an individual could perform sedentary work as a nonemergency dispatcher, a machine tender or a telephone order clerk. (R. at 51.)

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2011).

[3] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2011).

-4-

In rendering her decision, the ALJ reviewed records from Dr. Kevin Blackwell, D.O.; Norton Community Hospital; Dr. David Nauss, M.D.; The Regional Rehab Center; Urgent Care Clinic Holston Medical Group-Weber City; Kingsport Day Surgery; Indian Path Medical Center; Pain Medicine Associates; Blue Ridge Neuroscience Center; Dr. Robert McGuffin, M.D. a state agency physician; Wise County Department of Social Services; Dr. Fred Merkel, D.O.; Dr. Thomas Phillips, M.D.; Julie Jennings, Ph.D., a state agency psychologist; Dr. Chris Starnes, M.D.; Cavalier Pharmacy; Dr. Kathleen Caizzi, M.D.; Robert Spangler, Ed.D.; Dr. Richard Kubota, M.D.; Holston Medical Group; and Scott County Behavioral Health Services.

The medical evidence contained in these records show that Engle has been treated for back problems since at least 2000. On July 21, 2000, Engle saw Dr. Kevin Blackwell, D.O., for complaints of left shoulder pain. (R. at 233.) Dr. Blackwell diagnosed left rhomboid strain and cervical strain with possible radiculopathy. (R. at 233.) Dr. Blackwell ordered x-rays, which showed cervical disc disease. (R. at 231, 243.) Dr. Blackwell also prescribed Lortab, Soma and Vioxx. (R. at 229.) An MRI of the cervical spine taken on August 2, 2000, showed some mild degenerative changes with a broad-based disc protrusions at the C5-6 and C6-7 levels. (R. at 241.) Engle noted some improvement when he returned to see Dr. Blackwell on August 24, 2000. (R. at 229.) Dr. Blackwell diagnosed a C5-6 disc protrusion and recommended an orthopedic/neurosurgical consultation. (R. at 229.) Dr. Blackwell also stated that Engle should avoid heavy lifting. (R. at 229.)

On September 6, 2000, Engle returned reporting that he was doing

-5-

significantly better. (R. at 227.) Engle stated that he did have some occasional pain in his left arm and shoulder, but no radiating pain. (R. at 227.) Dr. Blackwell diagnosed cervical disc disease with nerve compression and recommended a surgical evaluation. (R. at 227.) Engle stated that he did not wish to pursue surgery because he was doing so much better. (R. at 227.) Engle stated that he was in no need of any further medication, and he wished no work restrictions because he could perform his full job without too much difficulty. (R. at 227.)

Lumbar spine x-rays taken on February 19, 2001, showed mild degenerative changes. (R. at 240.)

On July 1, 2002, Engle returned to Dr. Blackwell for complaints of lower back pain radiating into his left leg. (R. at 224.) Dr. Blackwell recorded no origin for Engle's back pain, but he did note that Engle stated the pain had worsened over the previous month. (R. at 224.) Dr. Blackwell noted that straight leg raises were positive on the left side and that Engle's sacroiliac joint was tender bilaterally. (R. at 224.) No spasm or deformities were noted. (R. at 224.) Dr. Blackwell stated that he would prescribe "medications for pain" and consider physical therapy and an MRI of Engle's spine if his symptoms worsened. (R. at 224.)

On July 16, 2002, Engle returned stating that he had been off of work for five days with persistent back pain. (R. at 222.) Dr. Blackwell noted that straight leg raises were positive with contra lateral tenderness in the left leg with right leg raise. (R. at 222.) Dr. Blackwell found Engle to be tender throughout the lumbar musculature with no spasm or deformities. (R. at 222.) Dr. Blackwell diagnosed

-6-

right sciatica and recommended an MRI of Engle's lumbar spine. (R. at 222.) He also stated that Engle should remain off of work for the next week. (R. at 222.)

An MRI of Engle's lumbar spine taken on July 17, 2002, showed some minimal disc space narrowing at the L4-5 and L5-S1 level with disc desiccation at the L5-S1 level. (R. at 238.) There was some mild degenerative change at the L4-5 level and a left paracentral disc herniation at the L5-S1 level which appeared to encroach on the left S1 nerve root with some mild posterior displacement. (R. at 238.)

Engle returned to Dr. Blackwell on December 9, 2002, stating that he had been working a new job that required more strenuous heavy work which had caused his back to bother him quite a bit over the past couple of days. (R. at 218.) Dr. Blackwell noted that Engle was tender in the lower lumbar musculature, with no spasm or deformities. (R. at 218.) Straight leg raises were negative, reflexes were intact, and there was no foot drop. (R. at 218.) Dr. Blackwell took Engle off work for one week and prescribed Lortab and a Medrol dose pack. (R. at 218.) On December 16, 2002, Engle reported that his pain had worsened. (R. at 216.) Dr. Blackwell recommended and MRI and epidural steroid injections, but Engle stated that he did not wish to do anything further. (R. at 216.) Dr. Blackwell excused Engle from work for a couple of weeks and gave him a prescription for pain medication. (R. at 216.)

On December 31, 2002, Engle returned reporting that he suffered persistent back pain radiating into his leg. (R. at 214.) He stated that the radiating pain was a 9

on a 10-point scale on a daily basis. (R. at 214.) He stated that his pain medication did help and that he did not want to undergo any surgical intervention or epidural steroid injections. (R. at 214.) Dr. Blackwell excused Engle from work for one more week, but advised that if he was not better by then, he should undergo a pain management consultation/neurosurgical evaluation. (R. at 214.) On January 7, 2003, Engle asked Dr. Blackwell to prescribe something to help him sleep at night and asked for Xanax. (R. at 212.) Dr. Blackwell told him to consult his family doctor or that he would refer his to a psychiatrist. (R. at 212.) On March 10, 2003, Dr. Davis Nauss, M.D., performed a lumbar epidutal sterioid injection on Engle. (R. at 265.) On March 11, 2003, Engle was discharged from physical therapy after attending only three sessions. (R. at 269.)

X-rays of Engle's thoracic spine taken on February 20, 2004, showed degenerative changes, with slight nerve root compression at the T11 level. (R. at 251.) X-rays of Engle's lumbar spine taken on the same date showed only mild degenerative changes. (R. at 252.) An MRI of the lumbar spine performed on January 6, 2006, showed broad-based disc bulging at the L3-4, L4-5 and L5-S1 levels with compression of the exiting L5 nerve root on the right. (R. at 246.) An MRI of the lumbar spine performed on January 18, 2007, showed diffuse spondylitic changes with a broad-based disc protrusion at the L3-4 level and mild bulging of the disc at the L5-S1 level. (R. at 245.)

Engle again saw Dr. Nauss on January 19, 2006. (R. at 262-64.) Dr. Nauss noted that palpation revealed diffuse lower lumbosacral tenderness with some focal tenderness at the T8-9 level. (R. at 264.) Dr. Nauss scheduled a trigger point

-8-

injection for January 26, 2006. (R. at 264.) It appears that Dr. Nauss saw Engle on January 26, 2006, February 1, 5 and 27, 2007, and March 10, 2003, but these notes are largely illegible. (R. at 255-60.)

Engle saw Dr. Christopher Starnes, M.D., from December 7, 2006, to April 16, 2009, for left sciatica and lumbar spine pain. (R. at 357-71, 399-400.) While much of Dr. Starnes's notes are illegible, it appears that he treated Engle's complaints with pain medication. It does appear that Dr. Starnes began prescribing Xanax for Engle's complaint of insomnia on March 23, 2007. (R. at 367.) On July 20, 2007, Engle also complained of significant anxiety. (R. at 364.) On February 7, 2008, Dr. Starnes specifically noted no psychiatric problems other than insomnia. (R. at 359.) He noted the same again on May 6, 2008. (R. at 358.) On June 16, 2008. Dr. Starnes noted that Engle complained of depression, and he prescribed Paxil. (R. at 357.)

On April 19, 2007, Engle saw Dr. Rebekah C. Austin, M.D, a neurosurgeon, for chronic lumbar pain. (R. at 307-10.) Engle reported suffering from back pain since 2003. (R. at 307.) Engle stated that his symptoms had gradually subsided over the years with conservative treatment. (R. at 307.) Engle stated that he had suffered episodic flare-ups, but that for the previous six months he had suffered persistent pain in his lower back with radiation into the posterior aspect of the left thigh and calf. (R. at 307.) Engle denied any muscle weakness or bowel or bladder dysfunction. (R. at 307.) Engle also complained of intermittent cervical pain radiating into his right upper extremity. (R. at 307.) Dr. Austin noted that Engle was working full-time as a cook. (R. at 307.)

-9-

Dr. Austin noted that Engle had normal range of motion of the head, neck and all four extremities. (R. at 308.) Straight leg raise was negative bilaterally. (R. at 308.) Strength and tone were normal with no atrophy in Engle's extremities. (R. at 308.) Dr. Austin diagnosed lumbar degenerative disc disease, low back pain, cervical spondylosis and neck pain. (R. at 309.) She ordered lumbar and cervical myelograms with CT scans. (R. at 309.) Dr. Austin noted that Engle could continue his regular employment as a cook. (R. at 309.)

Lumbar myleography with CT scan and cervical myelography with CT scan were performed on Engle on April 26, 2007. (R. at 288-89, 293.) The lumbar scan revealed a large generalized annular posterior disc bulge at the L3-4 level with bilateral exiting nerve root encroachment and a moderately sized generalized annular posterior disc bulge at L5-S1 with mild bilateral exiting nerve root encroachment. (R. 293.) The cervical scan revealed chronic degenerative disc disease at the C4-5, C5-6 and C6-7 levels. (R. at 289.) On May 22, 2007, an MRI of Engle's thoracic spine was performed which revealed a small focal bulge versus disc protrusion to the left of midline at the T8-9 level impressing on the thecal sac to the left of midline. (R. at 285.) Degenerative spurring anteriorly was scattered throughout his thoracic spine. (R. at 285.)

Engle returned to see Dr. Austin on May 29, 2007. (R. at 303-04.) Dr. Austin's note contains conflicting information regarding Engle's work abilities. It states: "He is currently unable to work as a cook. He is currently working and has not missed any work due to his symptoms. His date last worked was May of 2007." (R. at 303.) Dr. Austin reported that an MRI of Engle's thoracic spine performed on

May 22, 2007, revealed a small T8-9 disc protrusion. (R. at 304.) Dr. Austin referred Engle for a pain clinic evaluation. (R. at 304.) At another point, Dr. Austin's report stated: "The patient cannot return to work at this time." (R. at 304.) On October 9, 2007, Dr. Austin stated: "The patient cannot return to work at this time. Additionally, we do not feel the patient will be able to return to gainful employment. Further work issues will be per his primary care provider." (R. at 302.) Dr. Austin also noted that Engle reported situational depression. (R. at 301.)

On June 29, 2007, Engle saw Dr. James McCoy, M.D, at the Holston Medical Group Weber City Urgent Care Clinic with complaints of left posterior chest pain and left arm pain. (R. at 277-78.) An EKG showed normal sinus rhythm, and chest x-rays showed no masses or infiltrates. (R. at 278.) Dr. McCoy stated that Engle had "significant emphysema." (R. at 278.) He stated that Engle's pain was likely from his degenerative disc disease. (R. at 278.) Engle did not report that he was taking Xanax or any other psychiatric medication at that time. (R. at 277.)

Engle returned to see Dr. McCoy for a flare-up of back pain on August 29, 2007. (R. at 331.) On August 31, 2007, Engle returned with complaints of urinary frequency, vomiting and diarrhea. (R. at 328.) Engle returned on December 17, 2007, and saw Dr. Fred A. Merkel, D.O., with complaints of back pain. (R. at 326-27.) On February 15, 2008, Engle saw Dr. Merkel with complaints of neck pain. (R. at 324.) Engle stated that he had returned for refills of his medications. (R. at 324.) Dr. Merkel noted that "Patient is doing fairly good on his back pain." (R. at 324.)

-11-

Engle returned to the Holston Medical Group in Kingsport with complaints of pressure and pain in his chest on November 18, 2008. (R. at 425-27.) All testing was normal. Engle did not state that he was taking Xanax on that occasion, and he made no psychological complaints. (R. at 425.)   Engle returned on November 24, 2008, stating that he was feeling better. (R. at 423.) Again, Engle did not report taking Xanax and voiced no psychological complaints. (R. at 423-24.)

When Engle returned on December 16, 2008, the note does not document that he was taking Xanax. (R. at 421-22.) Nor does it document any psychological complaints. (R. at 421-422.) Oddly, howver, Karen Chase, F.N.P., assessed Engle as suffering from anxiety and stated that she would renew his prescription for Xanax. (R. at 422.)   Engle saw Chase again on January 16, 2009, complaining of an exacerbation of pain due to recent lifting and reaching overhead. (R. at 419.) Engle continued to take Xanax, but voiced no psychological complaints. (R. at 419.) This remained true on his February 19, 2009, visit as well. (R. at 417-18.) The first notation concerning any complaint of anxiety comes when Engle returned to see Chase on March 25, 2009. (R. at 415.)

Dr. Merkel saw Engle again on April 28, 2009, complaining of pain in his coccyx area. (R. at 413-14.) Engle said that he had fallen while walking in his yard the day before landing on his back and coccyx area. (R. at 413.) Dr. Merkel observed some slight bruising in the coccyx area with no swelling or redness. (R. at 414.) An x-ray of Engle's coccyx appeared normal. (R. at 414.)   Dr. Merkel instructed Engle not to do any excess walking or lifting and to be careful with transfers and ambulation. (R. at 414.) Dr. Merkel prescribed ibuprofen and told

-12-

Engle to continue to take his current pain medications. (R. at 414.) Engle did report that he was taking Xanax at that time, but the record does not contain any emotional or psychological complaints. (R. at 413.)

Engle saw Cynthia K. Dean, F.N.P., with Holston Medical Group, on May 5, 2009, complaining of falling a week previously when his left leg gave way. (R. at 411-12.) Dean requested additional x-rays and gave Engle a Toradol injection. (R. at 412.) Dean noted that Engle was taking Xanax, but she documented no emotional or psychological problem. (R. at 411-12.)

An MRI of Engle's lumbar spine was performed on May 7, 2009, after he complained for falling on April 27, 2009. (R. at 397.) The report noted some mild acute collapse of the superior endplate of the L1 vertebra. (R. at 397.) The report also noted herniated/protruding discs at the L3-4 and L5-S1 levels. (R at 397.)

Engle returned to physical therapy for a functional capacity evaluation on May 26, 2009. (R. at 408.) The therapist, however, declined to perform the evaluation based on Engle's complaint of recent lumbar injury and the acute nature of his symptoms. (R. at 408.)

On June 15, 2009, Engle returned to Dr. Merkel complaining of right throbbing leg pain for the previous four days. (R. at 406.) Engle denied injury, but stated that he did walk "quite a bit." (R. at 406.) Dr. Merkel noted slight swelling of Engle's right knee. (R. at 407.) Dr. Merkel gave Engle a Demerol injection. (R. at 407.) Dr. Merkel noted that Engle continued to take Xanax, but noted no emotional

-13-

or psychological complaint other than an inability to sleep due to pain. (R. at 406-07.)

Dr. Sameh A. Ward, M.D., with Pain Medicine Associates, saw Engle on July 27, 2007, for complaints of thoracic, neck, low back and left lower extremity pain. (R. at 379-81.) Engle stated that his thoracic pain started about nine months earlier. (R. at 379.) He stated that the pain was sharp and gripping in nature. (R. at 379.) Engle stated that his pain medication had helped with his back and left lower extremity pain. (R. at 379.) A questionnaire completed by Engle stated that he was suffering from relationship problems, depression and irritability. (R. at 382.) Engle reported that he continued to work as a cook at that time. (R. at 384.) Dr. Ward administered an epidural steroid injection at the T8-9 level of the thoracic spine on August 7, 2007. (R. at 298-99.) After the procedure, Engle reported substantial reduction in pain. (R. at 299.) When Engle returned to see Dr. Ward on September 7, 2007, however, he complained that the injection "did not do much" for him. (R. at 297.) Engle said that his pain was mild, but also said that it was a 9.5 on a 10-point scale. (R. at 297.) Dr. Ward stated that, since Engle did not respond to the injection, he would send him for physical therapy. (R. at 297.) Dr. Ward also stated that he informed Engle that "I do not see any contraindication for him to go back to work...." (R. at 297.) Dr. Ward did note that Engle's mood was depressed. (R. at 297.)

On October 19, 2007, Dr. Robert McGuffin, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Engle. (R. at 316-22.) Dr. McGuffin stated that Engle suffered from degenerative disc disease of

-14-

the thoracic and lumber spine which limited him to light work with only occasional climbing, stooping, kneeling, crouching and crawling. (R. at 317-18.)

On February 7, 2008, Dr. Austin completed a statement for the Wise County Department of Social Services saying that Engle could not work indefinitely due to chronic pain in his back, neck and leg. (R. at 323.) Dr. Austin stated that Engle suffered from spondylosis of the spine with degenerative disc disease, spasm and compression fractures and an anxiety disorder. (R. at 323.)

On February 29, 2008, Dr. Thomas Phillips, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Engle. (R. at 336-42.) Dr. Phillips stated that Engle suffered from degenerative disc disease of the thoracic and lumber spine which limited him to light work with only occasional climbing, balancing, stooping, kneeling, crouching and crawling. (R. at 336-38.) Dr. Phillips stated that Engle could stand and walk for up to four hours in an eight-hour workday. (R. at 337.) He also stated that Engle's ability to push and pull was limited in his lower extremities. (R. at 337.) Dr. Phillips stated that Engle also should avoid exposure to hazards such as machinery and heights. (R. at 339.)

On March 3, 2008, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on Engle. (R. at 343-56.) According to Jennings, Engle suffered from situational depression, but did not suffer from a severe mental impairment. (R. at 343, 346.) Jennings stated that Engle experienced only mild restrictions of activities of daily living, mild difficulties in maintaining social functioning and mild difficulties in maintaining

-15-

concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 353.)

Engle saw Robert S. Spangler, Ed.D., for a consultative psychological evaluation on March 17, 2009. (R. at 389-96.) Spangler noted that Engle appeared clean and appropriately dressed. (R. at 389.) He also observed a noticeable tremor in Engle's dominant right hand. (R. at 389.) Spangler stated that Engle appeared socially confident, but depressed and anxious. (R. at 389.) Spangler noted that Engle demonstrated good concentration and persistence, but that his pace on tasks was impacted by leg discomfort. (R. at 389.)

Engle complained of leg pain mostly in his left leg, back pain, anxiety, depression and migraine headaches. (R. at 389-90.) Despite claiming that his mental health problems started at age 10, Engle stated that he had never received any mental health treatment. (R. at 389-90.) Spangler noted that Engle was alert, oriented, anxious and depressed. (R. at 391.) His affect was blunted. (R. at 391.) He was cooperative, compliant and forthcoming. (R. at 391.) Spangler stated that Engle appeared to function in the low-average range of intelligence with no delusional thoughts or perceptual abnormalities. (R. at 391.)

Spangler administered the Weschler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), intelligence test, on which Engle obtained a verbal comprehension index of 85, a perceptual reasoning index of 82, a working memory index of 86, a procession speed index of 81 and a full-scale IQ of 80. (R. at 392.) Spangler noted that Engle's full-scale IQ placed him in the low-average range of

-16-

intelligence. (R. at 392.)   Spangler also administered the Wide Range Achievement Test – Fourth Edition, ("WRAT-4"), which showed that Engle's word reading was on the 8.1 grade level, his sentence comprehension was on the 9.9 grade level and his arithmetic computation was on the 4.2 grade level. (R. at 392.) Spangler stated that these results were consistent with Engle's estimated intelligence. (R. at 392.)

Spangler diagnosed Engle as experiencing an anxiety disorder, not otherwise specified, mild on medication, and a depressive disorder, not otherwise specified, mild to moderate. (R. at 393.) Spangler placed Engle's Global Assessment of Functioning, ("GAF"),[4] score at 55-60.[5] (R. at 393.) Spangler stated that Engle's prognosis was guarded and would not improve until his pain and medical conditions improved or stabilized with adequate pain management. (R. at 393.) Spangler also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) for Engle. (R. at 394-96.) On this form, Spangler stated that Engle's ability to follow work rules and to maintain attention and concentration was limited, but satisfactory. (R. at 394.) In every other category, Spangler placed Engle in between limited and seriously limited or in the seriously limited category, with the exception of one. (R. at 394-95.) Spangler stated that Engle had no useful ability to understand, remember and carry out complex job instructions. (R. at 395.)

---

[4] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[5] A GAF of 51-60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

Engle began treatment with Scott County Behavioral Health Services on October 29, 2009. (R. at 437.) Polly Easterling, B.S.W., noted that Engle complained of "severe" depression and anxiety. (R. at 437.) Engle complained of staying irritable and agitated. (R. at 437.) Engle stated that Chase had prescribed Xanax, Lexapro and Ambien. (R. at 437.) Engle denied any psychotic symptoms and stated that he just needed to talk with someone. (R. at 437.) Easterling noted that Engle was alert and oriented and that his mood was euthymic with congruent affect. (R. at 437.) She noted that Engle's interactions were friendly and cooperative and that Engle's condition appeared stable. (R. at 437.)

On November 16, 2009, Mary Alice Fields, M.Ed., completed an intake assessment of Engle. (R. at 434-36.) Fields assessed Engle as suffering from major depression and anxiety based on complaints of severe anxiety, jitteriness, worrying and depressed mood, moderate decrease in energy or fatigue, social withdrawal, filght of ideas, racing thoughts, anger, feeling worthless, irritability, loss of interest or pleasure, low self-esteem and marked mood shifts and mild panic attacks. (R. at 433-34.) Fields listed Engle's then-current GAF score at 50.[6] (R. at 434.)

On December 3, 2009, Engle reported coping well with his depression and anxiety. (R. at 432-33.) Fields noted that Engle's mood was stable, his affect was congruent with mood, and he was cooperative and communicative. (R. at 432.) On January 7, 2010, Fields noted that Engle's mood was calm, his affect was congruent with mood and he was cooperative and communicative. On February 11, 2010,

---

[6] A GAF of 41-50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

Engle saw Mary B. Raykowitz, L.P.C. (R. at 429.) Engle reported being in a great deal of pain. (R. at 429.) Engle stated that it was his attorney who told him that he needed to seek treatment at Scott County Behavioral Health Services and obtain records from there to submit on his social security claim. (R. at 429.) Engle reported that Lexapro was helping his depression, but not as much as he had hoped. (R. at 429.) He stated that he intended to speak to his physician about increasing the dosage. (R. at 429.) Raykowitz noted that Engle was euthymic. (R. at 429.) She stated that there was no evidence of hallucinations or delusions. (R. at 429.)

## III.   *Analysis*

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1250(a), 416.920(a) (2011).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the

Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2011); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated June 29, 2009, the ALJ denied Engle's claims. (R. at 9-21.) The ALJ found that Engle would meet the nondisability insured status requirements of the Act for DIB purposes through December 31, 2011. (R. at 12.) The ALJ also found that Engle had not engaged in substantial gainful activity since May 5, 2007, the alleged onset date. (R. at 12.) The ALJ determined that the medical evidence established that Engle had severe impairments, namely degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine with a herniated disc, degenerative disc disease of the thoracic spine with a herniated disc and obesity, but she found that Engle's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12-14.) The ALJ also found that Engle had the residual functional capacity to perform light work that did not require him to climb ladders, work around unprotected heights or use dangerous or vibrating machinery or do more than occasional crouching, crawling or stooping. (R. at 14-18.) The ALJ found that Engle also would need to change positions in place every 15 to 20 minutes and was limited to simple, noncomplex tasks. (R. at 14-18.) The ALJ also stated that Engle would work best in an indoor, climate-controlled environment. (R. at 14-18.)

-20-

Therefore, the ALJ found that Engle was able to perform his past relevant work as a disc jockey. (R. at 19.) Based on Engle's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ also found that there were other jobs, such as work as a nonemergency dispatcher, a machine tender and a telephone order clerk, that Engle could perform. (R. at 19-20.) Thus, the ALJ found that Engle was not under a disability as defined under the Act and was not eligible for benefits. (R. at 20.) *See* 20 C.F.R. §§ 404.1520(f)-(g) 416.920(f)-(g).

Engle argues that the ALJ's decision is not supported by substantial evidence. In particular, Engle argues that the ALJ erred by failing to find that he suffered from a severe mental impairment. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-8.) Engle also argues that the ALJ erred by not finding that his condition met or equaled the listed impairment for disorders of the spine. (Plaintiff's Brief at 8-11.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

-21-

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if she sufficiently explains her rationale and if the record supports her findings.

Engle argues that the ALJ erred by failing to find that he suffered from a severe mental impairment. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-8.) The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2011). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2011). The Fourth Circuit held in *Evans v. Heckler*, that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."'" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting

-22-

*Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

While Engle claims disability as of May 5, 2007, the record contains no evidence that he suffered any limitations as a result of psychological conditions until March 17, 2009, the date of Spangler's consultative evaluation. Spangler opined that all areas of Engle's work-related mental abilities were affected except for his abilities to follow work rules and to maintain attention and concentration. (R. at 394-95.) Unfortunately, the ALJ's opinion mischaracterizes Spangler's assessment as stating that the claimant's only difficulty would be in understanding, remembering and carrying out complex job instructions. In fact, the ALJ's opinion cites Spangler's opinion as if it supports, rather than contradicts, her finding of no severe mental impairment. (R. at 13.) Because of this, the ALJ does not address the conflict between her finding that Engle did not suffer a severe mental impairment and Spangler's assessment. (R. at 12-14.) As stated above, an ALJ may not reject medical evidence without stating her reasoning. For this reason, I find that substantial evidence does not support the ALJ's finding that Engle did not suffer from a severe mental impairment.

Engle also argues that the ALJ erred by not finding that his condition met or equaled the listed impairment for disorders of the spine. (Plaintiff's Brief at 8-11.) To meet the criterion for spinal disorders under § 1.04, a claimant must suffer the "compromise of a nerve root (including the cauda equina) or the spinal cord" along with one of several combinations of impairments. The first combination of potential symptoms includes, "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss

-23-

(atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (A) (2011). A second option includes, "[s]pinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every [two] hours." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (B) (2011). Finally, a claimant might be successful if that individual suffered from "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(C) (2011). Examples of conditions which satisfy § 1.04 include a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or a vertebral fracture. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (2011).

There is no medical evidence that Engle suffers from spinal arachnoiditis or stenosis resulting in pseudoclaudication. Therefore, Engle's condition cannot meet the requirements of § 1.04(B) or (C). The uncontradicted medical evidence does show that Engle suffers from degenerative disc disease with herniated/bulging discs. However, when Engle sought treatment by a neurosurgeon in 2007, she noted that he suffered from no deficit in muscle tone or weakness, and his straight leg raises were negative. Therefore, Engle's condition does not meet the criteria for § 1.04(A) either. For this reason, I find that substantial evidence exists in the record

-24-

to support the ALJ's finding that Engle's condition does not meet or equal the listed impairment for spinal disorders.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence does not exist to support the Commissioner's finding that Engle did not suffer from a severe mental impairment;

2.  Substantial evidence exists to support the Commissioner's finding that Engle's condition did not meet or equal the impairment listed at § 1.04; and

3.  Substantial evidence does not exist to support the Commissioner's finding that Engle was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Engle's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the final decision of the Commissioner denying benefits and remand these claims for further consideration.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. §

636(b)(1)(C) (West 2006 & Supp. 2011):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:        September 28, 2011.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-26-